UNITED STATES of America, Appellee,

v.

Michael G. MORGAN, Defendant–Appellant.

No. 298, Docket 94–1121.

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1994.

Decided April 3, 1995.

Hubert J. Santos, Hartford, CT (Hope C. Seeley, Santos, Peck & Smith, P.C., of counsel), for appellant.

Kari A. Pedersen, Asst. U.S. Atty., Bridgeport, CT (Christopher F. Droney, U.S. Atty., D. Conn., New Haven, CT, of counsel), for appellee.

Before: FEINBERG, KEARSE, and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Michael G. Morgan takes this interlocutory appeal from the denial of a motion to dismiss a pending indictment against him entered in the United States District Court for the District of Connecticut on January 21, 1994, before Judge T.F. Gilroy Daly. The appeal raises a question as to whether defendant's constitutional right against being twice put in jeopardy for the same offense was violated. Having signed a consent judgment respecting civil charges brought against him, Morgan now maintains that $1.5 million of the restitution payments imposed on him by the settlement, which sum the consent order labeled a "personal obligation," was in essence a punitive civil sanction precluding the government from later indicting him.

The key word to be understood on this appeal is "punishment." If a person is twice subject to punishment for the same offense, double jeopardy protection attaches. It is our task to determine whether the heavy repayment obligations imposed here do or do not constitute punishment; if they do not, the double jeopardy defense has no application. The Supreme Court gives guidance when it tells us that a civil sanction constitutes punishment when the goal it serves is for purposes of deterrence or retribution. Such goal is evidenced when the sanction is overwhelmingly disproportionate to the damages caused. *See United States v. Halper,* 490 U.S. 435, 448–49, 109 S.Ct. 1892, 1901–02, 104 L.Ed.2d 487 (1989). Thus, an overwhelmingly disproportionate sanction may be present where the civil sanction bears so little relationship to making the government whole as to shock the conscience of the court.

In this case, because there has been no showing of an overwhelmingly disproportionate sanction, the criminal prosecution of Morgan does not offend the Double Jeopardy Clause.

## BACKGROUND

Appellant Morgan was a founder, the chief executive officer, and a member of the Board of Directors of Charter Federal Savings and Loan Association (Charter Federal or bank) organized in 1984 and located in Stamford, Connecticut. The bank created a wholly-owned subsidiary called Bedford Equities Corporation to acquire real estate for development purposes. Bedford Equities, the development corporation, was a general partner of a limited partnership called Bedford Equities 1984 Limited Partnership that syndicated real estate acquired by Bedford Equities Corporation. Among the real estate purchases made by Bedford Equities Corporation were three Stamford properties: 1200 Summer Street, 30 Buxton Farms Road, and 159 Franklin Street.

The Resolution Trust Corporation seized Charter Federal in 1990. Following the seizure, the United States Department of the Treasury's Office of Thrift Supervision (OTS) began an investigation into the activities of certain of the bank's officers and directors.

This investigation culminated on January 19, 1993 with the filing against Morgan of a Notice of Charges pursuant to 12 U.S.C. § 1818(b). Simultaneously with the filing of this Notice, there were also filed a stipulation of settlement between Morgan and the government, and a consent order and consent judgment with respect to the claims contained in the civil charges.

The five charges in the Notice involved Morgan's role in four separate real estate transactions during the period 1984–1987. Charge one alleged that when voting to finance Bedford Equities' purchase of 1200 Summer Street, he hid his $67,500 commission on the transaction by the use of a "straw" broker; charge two asserted that in improperly structuring bank financing for the sale of 30 Buxton Farms Road so as to show a false profit, Morgan falsely inflated Charter Federal's income and caused it to lose in excess of $1 million dollars when the purchasers defaulted; charge three involved the same Buxton Farms Road property and charged Morgan with paying another bank director, again through a "straw" broker, a $200,000 commission. It was further asserted in this charge that to improve Charter Federal's books the payment was ostensibly waived, but in fact was later siphoned into the board member's pocket, disguised as part of a payment to the same "straw" broker on the 159 Franklin Street sale. Count four charged Morgan with falsely structuring the sale of 159 Franklin Street to meet the criteria for profit recognition by disguising a $450,000 loan as for "development" of the property when in fact the loan was used as a down payment on the purchase of the property. The fourth charge claimed loss and other damage to the bank of over $1 million on this transaction. The fifth and final charge involved Lindale Manor, a condominium complex owned by Lindale Partners. It alleged that Morgan caused Charter Federal to make loans to Lindale Partners, a partnership in which he held a one-third interest. Because this conduct was not reflected in the pending indictment, it is not a subject of this appeal. In sum, based upon the first four counts of the Notice, Morgan was charged in

all with causing Charter Federal to incur losses in excess of $2,275,000.

Simultaneously with the issuance of the formal Notice of the charges just related, the government notified Morgan pursuant to 12 U.S.C. § 1818(b) that the OTS intended to prohibit him from participating in the conduct of the business of any federally insured depository institution. All of the civil claims the OTS had against Morgan were settled through the execution of the earlier referred to stipulation, consent order and consent judgment.

Under the settlement, Morgan neither admitted nor denied the charges made against him. Pursuant to the settlement agreement, he signed a consent judgment that ordered him to pay $300,000 as restitution to OTS. Under the terms of the consent order, he agreed to pay $1.5 million to OTS in addition to the $300,000 imposed by the consent judgment. Both sums were to be repaid according to an agreed-upon payment schedule that was made contingent on the extent of Morgan's future gross income. OTS agreed to refrain from executing the judgment so long as the payment schedule was complied with. Morgan has to date made no payments under the settlement.

The relevant portion of the consent order reads:

*RESTITUTION*

3. Based upon his sworn statement of financial condition and other relevant factors . . .:

a. RESPONDENT shall execute the annexed consent judgment in the amount of $300,000 *to correct the conditions alleged to have resulted from the unsafe and unsound practices and violations* of law, regulations and rules set forth against the RESPONDENT in the NOTICE. . . .

b. In addition to the judgment, RESPONDENT also agrees to pay the further sum of $1,500,000 pursuant to the schedule set forth in Subparagraph 3.c. *This payment obligation is a personal obligation of the RESPONDENT* and upon his death will not be an obligation of his estate.

(Consent Order at 2–3) (emphasis added). The stipulation provides that:

11. This STIPULATION and CONSENT, the ORDER, and RESPONDENT'S compliance with the ORDER, do not compromise, settle, dismiss, resolve, or in any way affect:

. . . .

b. any civil or criminal claims, actions, or charges against or liability of RESPONDENT or any other individual or entity asserted by any governmental entity other than the OTS.

(Stipulation at 5).

In September 1993, eight months after the execution of the settlement documents, a Connecticut federal grand jury returned a six-count indictment against Morgan, charging him with two counts of bank fraud, in violation of 18 U.S.C. § 1344, and four counts of misapplying bank funds, in violation of 18 U.S.C. § 657. The charges stem from appellant's alleged misapplication of bank funds with respect to the Summer Street transaction, and his alleged scheme to defraud the bank with respect to the sales of the Buxton Farms Road and Franklin Street properties. All the criminal charges set forth in the indictment stem from the same events addressed by the January 19, 1993 civil Notice of Charges.

Morgan promptly moved to dismiss the indictment as violative of his Fifth Amendment right against double jeopardy. Upon Judge Daly's denial of the motion, Morgan brought this interlocutory appeal. We affirm.

DISCUSSION

■ Before considering whether the indictment places defendant Morgan twice in jeopardy for the same offense, we note that this interlocutory appeal from a denial of a motion to dismiss on double jeopardy grounds is within the collateral order exception to the rule that appeals may be taken only from final judgments. *See Abney v. United States,* 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977); *United States v. Amiel,* 995 F.2d 367, 369 (2d Cir. 1993); *United States v. Helmsley,* 864 F.2d

266, 268 (2d Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989). Further, because a motion to dismiss on double jeopardy grounds presents a question of law, we review it *de novo. See United States v. Botello,* 991 F.2d 189, 192 (5th Cir.1993) (review of denial by district court of motion to dismiss indictment on double jeopardy grounds is *de novo* ), *cert. denied,* —— U.S. ——, 114 S.Ct. 886, 127 L.Ed.2d 80 (1994). We turn to the merits.

### I Double Jeopardy Waiver

Analysis turns first to whether appellant waived his right to assert a double jeopardy defense to the indictment laid against him. Morgan contends the district court determined in essence that when he entered into the stipulation, consented to the issuance of the order, and signed the consent judgment, he was aware of the possibility of subsequent criminal prosecution, and therefore waived this defense. Although no explicit finding of such a waiver was made, the district judge did point to that language in the settlement documents which stated that Morgan's compliance with the terms of the settlement did not settle, dismiss or resolve or affect in any way any "criminal claims, actions, or charges" asserted by the government against Morgan.

The government believes this language evidences appellant's recognition at the time he executed the settlement documents of the pending criminal investigation. There is no doubt Morgan was aware the United States Attorney's office had been investigating him since 1990. But Morgan does not believe the language of the civil settlement can be construed, following his indictment, as a waiver of his right to raise a double jeopardy defense. He maintains the cited language simply preserves for the government its right to institute further proceedings against him.

In *United States v. Hudson,* 14 F.3d 536 (10th Cir.1994), upon which Morgan heavily relies, the Tenth Circuit held that since a waiver of a constitutional right must be knowing and intelligent, a consent order signed by appellants was too vaguely worded to prevent them from asserting a double jeopardy claim. The order read: "[N]othing herein constitutes, nor shall Respondent contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States . . . to bring other actions. . . ." *Id.* at 539. This purported waiver was held ineffective because it did not explicitly state that appellants waived their right to assert a double jeopardy defense were such actions brought. *Id.*

 A waiver of a constitutional right must be voluntary, knowing and intelligent, that is, the act of waiver must be shown to have been done with awareness of its consequences. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970). In examining a purported waiver of the double jeopardy right, we must draw all reasonable presumptions against the loss of such a right. *See Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The purported waiver in Morgan's stipulation did not *explicitly* recognize the renouncement of a double jeopardy defense against future criminal proceedings. *See Hudson,* 14 F.3d at 539. It would have been easy enough for such language to be included in the consent order. In fact, Morgan points out that subsequent consent orders drafted by the OTS—set forth in his reply brief—have included such a specific double jeopardy waiver.

Morgan's conceded knowledge that a criminal investigation was pending against him when he signed the stipulation may not, standing alone, establish that he made a knowing and intelligent waiver of his constitutional right to assert a double jeopardy defense. Because the settlement did not contain language expressly stating that Morgan would be barred from asserting this defense in future criminal proceedings, it could not operate as an effective waiver of Morgan's constitutional right. Were the rule otherwise, the government, when entering into a civil settlement, could safely prevent any double jeopardy defense being raised in a later criminal proceeding simply by advising the putative defendant of the existence of a criminal investigation against him. We

reject the notion that a constitutional right may be waived in such an implied fashion.

## II Double Jeopardy

### A. *History of the Concept*

Analysis turns next to the merits of the motion to dismiss. But before engaging in that discussion, it is useful for purposes of that analysis to make a somewhat detailed examination of the historical development of the Double Jeopardy Clause. That Clause found in the Fifth Amendment to the United States Constitution states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." The phrase "life or limb" has a quaintly archaic ring—striking the ear somewhat oddly, perhaps, in its application to a civil sanctions case—yet resonating profoundly with its historical origins.

While the concept of double jeopardy first emerged in the English common law nearly seven hundred years before its adoption in the United States Constitution's Bill of Rights, its roots lie even deeper in antiquity. Known to the Greeks and Romans, *see Benton v. Maryland*, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969), the notion of double jeopardy is found in the *Digest of Justinian* promulgated in the year 533, *see* Barry Nicholas, *An Introduction to Roman Law* 48 (Oxford Univ. Press 1962). There the concept is expressed as "The governor should not permit the same person to be again accused of a crime of which he had been acquitted." Jay A. Sigler, *Double Jeopardy: The Development of a Legal and Social Policy* 2 (Cornell Univ. Press 1969) (quoting the *Digest of Justinian*, Bk. 48, Title 2, n. 7). The canon law had also long recognized that even God does not punish twice for the same act. *See Bartkus v. Illinois*, 359 U.S. 121, 152 n. 4, 79 S.Ct. 676, 696 n. 4, 3 L.Ed.2d 684 (1959) (Black, J. dissenting).

These early civil and canon law roots from which, over the centuries, the modern notion of double jeopardy grew began to be evident in the common law of England during the twelfth-century reign of King Henry I (1100–1135), when the need for double jeopardy protection was particularly marked because punishment upon a second conviction for almost any offense was death or mutilation. Hence, the historical derivation of the Fifth Amendment phrase "in jeopardy of life or limb" is from a gruesomely literal source. *See* Sigler, *Double Jeopardy* at 4–5.

The doctrine gained a more secure foothold in the common law during the reign of King Henry II (1135–89), arising out of the king's close relationship to Thomas à Becket, his Lord Chancellor and later Archbishop of Canterbury. Becket, using his high church office, challenged Henry II's Clarendon Articles, which made the clergy, already subject to trial and punishment in ecclesiastical courts, subject also to being convened before lay judges. *See* Sir Matthew Hale, *The History of the Common Law of England* (Univ. of Chicago Press 1971). The controversy between the two erstwhile friends resulted in Becket's murder, and his subsequent canonization. But in 1176 Henry II conceded St. Thomas' point that "no man ought to be punished twice for the same offense," thereby firmly fixing the notion of no double punishment in the common law. *See* Martin L. Friedland, *Double Jeopardy* 5 (Oxford Univ. Press 1969).

The important aspect of the rule that for modern day purposes limits the sovereign's power to prosecute did not become a feature of double jeopardy in England until the end of the thirteenth century. Prior to that time criminal prosecution frequently depended on suits by private persons. The practice of initiating criminal prosecution by private appeal was a survival of Anglo–Saxon law, and was not wholly abolished in England until 1819. Sigler, *Double Jeopardy* at 8; Friedland, *Double Jeopardy* at 8. During the thirteenth century indictments by the Crown existed in parallel with private prosecutions. Sigler, *Double Jeopardy* at 8. A judgment of acquittal or conviction in a suit brought by a private person barred that person's further suit, and judgment on an indictment by the Crown barred further suit by the Crown. But double jeopardy principles did not prevent the Crown from bringing further suit in cases where a private person's suit had resulted in an acquittal. By the fifteenth cen-

tury acquittal on a private appeal, after trial by jury, barred indictment by the Crown, and an acquittal on an indictment, generally barred further prosecution for the same offense by appeal. *See* Friedland, *Double Jeopardy* at 8–9. Thus, the right of private appeal fell into disuse, and repeated prosecution for the same crime began to be eliminated. Sigler, *Double Jeopardy* at 8–9.

The two English common law commentators who most influenced colonial American jurisprudence were Sir Edward Coke and Sir William Blackstone. Blackstone in his Commentaries penned the oft-quoted statement: "The plea of *autrefois acquit*,[1] for a former acquittal, is grounded on the universal maxim . . . that no man is to be brought into jeopardy of his life, more than once, for the same offense." 4 William Blackstone, *Commentaries on the Laws of England* 329 (Univ. of Chicago Press 1979). During the seventeenth century when Coke's writings appeared, double jeopardy began to assume the outline of its present form. *See* Friedland, *Double Jeopardy* at 11. Yet even in the writings of Coke and Blackstone the protection is narrower than in contemporary American doctrine. Sigler, *Double Jeopardy* at 16–17. Coke believed that double jeopardy was not an absolute, but a conditional protection, depending on the quality of the prior acquittal. *Id.* at 18. Blackstone noted that the concept was limited to felonies, and that for the doctrine to apply there was a requirement for either a guilty verdict or an acquittal. *Id.* at 20.

That double jeopardy in America is a more fundamental right than in England may be traced back to early colonial times. The Massachusetts Bay Colony extended its protection to *all* criminal prosecutions and to civil trespass as well. In New England's first established code of laws, the *Body of Liberties*, that Colony provided: "No man shall be twise sentenced by Civill Justice for one and the same Crime, offence, or Trespasse." *The Massachusetts "Body of Liberties", No. 42, in American Historical Documents, 1000–1904*, at 70, 77 (Harvard Classics ed., P.F. Collier & Son 1910). James Madison, who fathered the doctrine in the Bill of Rights (1791), proposed that it read: "No person shall be subject, except in cases of impeachment, to more than one punishment or trial for the same offense." *See* Friedland, *Double Jeopardy* at 28, 30. The Supreme Court later stated as a settled principle of the common law that no person may be twice punished in the same court on the same facts, for the same offense, or "as Coke has it, '*Nemo debet bis puniri pro uno delicto.*' No one can be twice punished for the same crime or misdemeanor . . . ." *Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 169, 21 L.Ed. 872 (1873).

### B. *Modern Jurisprudence*

With this historical background in mind, we address the modern jurisprudence of the doctrine. Today, as its long history makes clear, the Double Jeopardy Clause protects an individual against multiple punishments for the same offense. *See Halper,* 490 U.S. at 440, 109 S.Ct. at 1897. In modern American law the punishment in question need not be death, maiming or mutilation; nor need the offense be a capital crime or even a felony. The American concept is more generous. It is viewed as an inherent part of our fundamental freedoms that a person accused of any offense, having once suffered punishment, once been convicted, or once won acquittal, is forever immune from further prosecution for that same offense.

 Because the concept is so broad, the Supreme Court has held that it applies even to certain fines. A civil sanction may constitute "punishment" for double jeopardy purposes where the sanction is "overwhelmingly disproportionate" to the damages the defendant caused. *See id.* at 449, 109 S.Ct. at 1902. In such a case, the civil sanction serves not a remedial, but rather a deterrent or retributory function. *Id.* *Halper*'s test for assessing the nature of civil sanctions is a "rule of reason." *See United States v. 38 Whalers Cove Drive,* 954 F.2d 29, 34 (2d

---

1. The Supreme Court tells us double jeopardy was historically understood as embracing three common-law pleas—*autrefois acquit, autrefois convict,* and pardon—that barred the retrial for the same offense for which defendant had already been acquitted, convicted, or pardoned. *See United States v. Scott,* 437 U.S. 82, 87, 98 S.Ct. 2187, 2191–92, 57 L.Ed.2d 65 (1978).

Cir.), *cert. denied sub nom. Levin v. United States,* —— U.S. ——, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992).

■ The double jeopardy inquiry is not concerned with the label of a sanction, but only with whether the characteristics of the sanction are punitive in nature, that is, what purpose they serve. *See Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, ——, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994) (tax sanction constituted impermissible second punishment where not rationally related to damages suffered by the government). Thus, we have held that *Halper* does not apply to forfeiture claims. *See United States v. United States Currency in the Amount of $145,139,* 18 F.3d 73, 74–75 (2d Cir.) (the *res* itself, in this case, the money being the culprit, a criminal proceeding *in personam* cannot affect it), *cert. denied sub nom. Etim v. United States,* —— U.S. ——, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994); *accord United States v. Torres,* 28 F.3d 1463, 1465–66 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994); *but see United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1221–22 (9th Cir.1994). Defining *Halper* narrowly, we have also declined to apply it to prison disciplinary sanctions, *see United States v. Hernandez–Fundora,* 49 F.3d 848, 852 (2d Cir. Feb. 14, 1995) (disciplinary sanctions not punishment where not "grossly disproportionate to the remedial goal of maintaining order and discipline in the prison"); *accord United States v. Newby,* 11 F.3d 1143, 1145–46 (3d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994), and to civil contempt fines, *see United States v. Mongelli,* 2 F.3d 29, 30 (2d Cir.1993) (per curiam) (civil contempt fines of $10,000 per day were coercive and not punitive in nature and therefore not subject to double jeopardy claims under *Halper*).

■ Where there is no showing of an intent to punish, a court must examine the sanction to see if it serves a legitimate nonpunitive government purpose. *See Bell v. Wolfish,* 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979). A line is drawn because civil actions instituted to remedy or recoup financial losses the government has suffered, on the one side, and actions taken to achieve retribution or deterrence in order to uphold public justice, on the other side, are separate and distinct. Unless a sanction serves solely remedial purposes, it must be characterized as punishment. *See United States v. 38 Whalers Cove Drive,* 954 F.2d at 35. While both criminal and civil punishments may lawfully be provided by Congress for the same conduct, it is only the government's action to punish the same conduct on two separate occasions that subjects a defendant to double jeopardy. *See United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548–49, 63 S.Ct. 379, 386–87, 87 L.Ed. 443 (1943).

### III Merits of Double Jeopardy Defense

#### A. *Preliminary Issues*

■ We pass now to a discussion of the merits. The Double Jeopardy Clause protects a person from prosecution for the same offense following either an acquittal or a conviction, and it protects also against multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969). Morgan cannot claim prosecution for the same offense arising after an acquittal or conviction because the initial civil proceeding did not result in either. Instead, Morgan avers he is being subjected to multiple punishments for the same offense, citing *Halper,* 490 U.S. at 440, 109 S.Ct. at 1897.

Before applying the *Halper* analysis to the facts of the instant case, there are two preliminary questions to be addressed. First, the government suggests that appellant's reliance on *Halper* is entirely misplaced because there, contrary to the facts of the instant case, the criminal trial and conviction preceded the attempted imposition of civil penalties for the same conduct. Other circuits have ruled that *Halper* applies when the civil sanction precedes the criminal prosecution. *See, e.g., United States v. Hudson,* 14 F.3d 536, 540 (10th Cir.1994); *United States v. Sanchez–Escareno,* 950 F.2d 193, 199 (5th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 123, 121 L.Ed.2d 78 (1992); *United States v. Mayers,* 897 F.2d 1126, 1127

(11th Cir.), *cert. denied,* 498 U.S. 865, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990). We have not explicitly so ruled. *See United States v. Amiel,* 995 F.2d at 370. The district court, persuaded by the reasoning of other circuits, correctly ruled that *Halper* applied to this case.

■ The recited history of the double jeopardy doctrine in America demonstrates its broad application from the earliest days to civil offenses as well as criminal, unlike in England where, as Blackstone tells us, double jeopardy was only available in a criminal proceeding following an acquittal or conviction. Because of this clearly broadened protection in America, we are firmly persuaded that the shield of double jeopardy remains in place regardless of the happenstance of whether the civil proceeding or criminal prosecution arising from the same offense comes first. We now rule that such a fortuitous circumstance is of no moment in double jeopardy analysis. In short, double jeopardy protection may be claimed by a defendant whose indictment follows the imposition of a punitive civil sanction for the same offense.

Second, the government also urges that the $1.8 million financial obligation imposed on Morgan is not a civil penalty provided for by statute. Because the OTS had no statutory authority to impose a fine,[2] the payment imposed was, according to the government, not a fine by definition. In its brief, it declares the OTS *could not, and therefore did not* impose a statutory penalty upon Morgan. Therefore, the government concludes, Morgan's repayment obligation is to be construed simply as a personal debt—and a debt does not trigger double jeopardy protections.

■ We do not think the distinction between a personal obligation negotiated by settlement, and a fine fixed by statute, controls the double jeopardy analysis. As *Halper* noted, "This constitutional protection is intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individu-

al *by the machinery of the state."* 490 U.S. at 447, 109 S.Ct. at 1901 (emphasis added). In this case, the machinery of the state, as embodied by the OTS, compelled Morgan into undertaking this financial obligation. It is not controlling for analytical purposes whether that compulsion was or was not statutorily authorized.

■ Even were the government to have acted beyond its authority in punishing an offender against its laws, the protections of the Double Jeopardy Clause are nonetheless triggered when the government acts to punish the same offender a second time. The government's argument boils down to this: if the OTS settlement with Morgan went beyond restitution, then the OTS exceeded its statutory authority in reaching it. We do not think governmental overreaching—if it occurred and if it amounted to punishment—will prevent Morgan from now asserting his constitutional right to be free from a second punishment for the same offense.

### B. *Application of* Halper

■ Having concluded our examination of these threshold issues, analysis now turns to the rules laid down in *Halper.* The Supreme Court teaches that the purpose served by the civil sanction must be ascertained in order to determine whether it constitutes punishment. *See* 490 U.S. at 448–49, 109 S.Ct. at 1901–02. Labels such as "criminal" and "civil," "fine" and "repayment" are not controlling. They may not be used to defeat the safeguards guaranteed citizens under the Constitution. *See Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1946 (label of tax does not end double jeopardy scrutiny because "at some point, an exaction labeled as a tax approaches punishment."); *Hicks v. Feiock,* 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988). The question in each case is whether the sanction does more than merely compensate the government for its damages and costs. Normally the trial court must undertake a rough calculation to

---

**2.** The civil penalty provisions available to the OTS today under 12 U.S.C. § 1818(i) did not become effective until the passage on August 9, 1989 of the Financial Institutions Reform, Recov-

ery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, § 907(a), 103 Stat. 183, 462–63 (1991).

determine whether the size of the sanction can be fairly attributed solely to remedial purposes or whether it must be deemed— because of its disproportion in relation to making the government whole—also to have been imposed for purposes of punishment. *See Halper,* 490 U.S. at 448–49, 109 S.Ct. at 1901–02.

Before undertaking this calculation we note Morgan's contention that it is Charter Federal, not the government, which sustained losses in excess of $2,275,000. The inference he would have us draw is that this figure may not be used in assessing the damage his conduct caused the government. His argument is not persuasive because Charter Federal's seizure by the Resolution Trust Corporation was attributable, at least in part, to Morgan's misconduct. Although the actual losses ultimately sustained by the government are not identical with the harm Morgan inflicted on the bank, the latter figure is a reasonable measure of the portion of the government's damages that have been occasioned by Morgan's actions.

In addition, Morgan claims that in his case no accounting of the government's damages and costs is necessary because the clear language of the consent order and judgment divided the remedial and retributive penalties into two separate categories: a $300,000 judgment "to correct the conditions alleged to have resulted" from his violations of law, and an additional fine of $1.5 million, labeled a "personal obligation." Since only the former is labeled remedial, Morgan insists that the latter larger fine is plainly punishment. Ironically, Morgan's argument depends on the importance of a label, even as he disavows reliance on such tags.

The district court concluded that the only goal of the OTS civil proceeding was to obtain restitution and Morgan's agreement not to further participate in the conduct of the affairs of a financial institution. The trial court based this conclusion on a careful reading of the OTS documents themselves, which revealed that those documents consistently refer to both of the payments imposed as "restitution." The consent order includes the $1.5 million "personal obligation" as a subsection of Paragraph Three, entitled "Restitution." Elsewhere in the consent order, the payments ordered under that paragraph are referred to as Morgan's "obligation to reimburse against loss."

Moreover, the district court did not simply rely on its own competing assessment of the labels the OTS documents attached to the monetary payments. Judge Daly went on to consider the underlying purpose of the settlement. He found that although the Notice of Charges averred that the bank lost $2,275,-000, the consent judgment of $1.8 million represented a compromise of the amount the bank lost that reasonably could be attributed to Morgan's conduct. No other basis for the compromise is set forth in the settlement documents.

■■■■ A defendant must make a threshold showing of "punishment" before a court undertakes a double jeopardy analysis. *See United States v. Mongelli,* 2 F.3d at 30. In the context of a civil sanction, this threshold is met by showing the sanction to be overwhelmingly disproportionate to the government's damages and expenses. Leeway is given to achieve "rough justice" when computing the precise amount of damages and costs the government suffered. *See Halper,* 490 U.S. at 449, 109 S.Ct. at 1902; *38 Whalers Cove,* 954 F.2d at 34–35. Only in the rare case where such disproportion is shown does the burden of accounting for its damages and costs fall on the government. *Halper,* 490 U.S. at 449–50, 109 S.Ct. at 1902–03. This is not that case. We cannot say that this civil sanction is so divorced from the reality of what the government suffered in damages and expenses as to constitute punishment. *See Halper,* 490 U.S. at 442, 109 S.Ct. at 1898. Rather, the dollar amount of the compromise we think falls within the bounds of doing rough justice.

In sum, appellant has failed to make a threshold showing that any of the terms of the civil settlement could be construed as punishment. Consequently, double jeopardy protection does not attach, and the government could lawfully file an indictment against Morgan after imposing a civil sanction against him for the same conduct.

## CONCLUSION

The denial of the motion to dismiss the indictment against defendant Morgan is accordingly affirmed.