**UNITED STATES of America, Appellee,**

**v.**

**Kurian CHACKO, Defendant–Appellant.**

**Docket No. 98–1087**

United States Court of Appeals,
Second Circuit.

Argued Nov. 20, 1998.

Decided March 1, 1999.

Robert Koppelman, New York, NY, for Defendant–Appellant.

David C. Finn, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Alexandra A.E. Shapiro, Assistant United States Attorney, of counsel), for Appellee.

Before OAKES, WALKER, and McLAUGHLIN, Circuit Judges.

OAKES, Senior Circuit Judge:

Defendant-appellant Kurian Chacko was tried before a jury for bank fraud in violation of 18 U.S.C. § 1344, making false statements to a bank in applying for a loan in violation of 18 U.S.C. § 1014, and conspiracy to commit both crimes. The jury returned a guilty verdict on five of six counts in the indictment. Chacko appeals from the district court's refusal to vacate the jury's verdict against him, and he appeals from the 121–month sentence imposed by the district court. Chacko contends that the indictment was multiplicitous, the jury's conviction was against the weight of the evidence because the intent to harm the bank was not established, the prosecution's summation was prejudicial, and the four-level enhancement assessed against him in sentencing was not justifiable. We affirm the district court.

*Background*

In April 1992, Kurian Chacko, owner of Balogh Jewelers ("Balogh"), submitted a signed letter to the State Bank of India ("the Bank") requesting a five million dollar loan for Balogh. Chacko stated in the letter that he needed the money to replenish Balogh's jewelry inventory because he was sending Balogh's existing inventory to a new venture in the Middle East. In support of the loan application, he submitted numerous false documents such as personal financial statements, tax returns, and balance sheets for Balogh. As compared to both Chacko's and Balogh's tax returns filed with the Internal Revenue Service, the documents Chacko submitted to the Bank significantly overstated income, sales, and assets.

Over the next few months, Chacko submitted to the Bank many more false documents in support of the loan application. These submissions individually comprised Counts Two through Five of the indictment under 18 U.S.C. § 1014. Count Six of the indictment, for general bank fraud under 18 U.S.C. § 1344, was based on the various lies, misrepresentations, and basic conniving acts detailed below that comprised Chacko's scheme to obtain two loans from the Bank.

Chacko submitted jewelry invoices which were altered as to date or value, according to the testimony of merchants with whom he had done business, and incorrectly indicated that he had recently purchased jewelry worth substantial sums. The submissions were the basis for Count Two of the indictment under 18 U.S.C. § 1014.

In June 1992, Chacko submitted appraisals to the Bank in support of the loan application that formed the basis for Count Three of the indictment under 18 U.S.C. § 1014. These appraisals were purportedly done by Leo Lalieu of Lalieu Bijoux, a jewelry repair business. The appraisals, valuing Balogh's inventory at about $19 million and the store at approximately $20 million, were on Lalieu's business stationery and were allegedly signed by Lalieu. Lalieu testified at trial, however, that he never examined Chacko's store, books, and inventory, and he never signed the appraisal forms.

Counts Four and Five were based on separate submissions to the Bank of forged appraisals purportedly done by Simon Teakle of Christie's. In July 1992, in support of Chacko's loan application, he submitted to the Bank a fraudulently altered Christie's appraisal valuing forty-six of Balogh's stock items at over $15 million; this was the basis for Count Four. Teakle testified at trial that, while he did perform an appraisal for Chacko in 1992, he valued Balogh's inventory at less than $3 million. Count Five was based on a later fraudulent appraisal document, again allegedly by Teakle. Chacko submitted this appraisal, which Teakle testified was forged, to the Bank in September 1993 in support of

a request by Chacko for an additional $1 million loan.

In August 1992, the Bank agreed to loan Chacko $4 million of the originally requested $5 million. At that time, Chacko signed a Credit Agreement ("the Agreement") with the Bank which provided, among other things, that (1) Chacko would submit financial records for himself and Balogh to the Bank; (2) Balogh would maintain an inventory of at least $15 million at its New York store and would submit monthly statements to the Bank indicating that the inventory levels were met; (3) Chacko would obtain an appraisal by Christie's of Balogh's inventory prior to any loan extension or renewal; (4) all of Balogh's jewelry purchases would be made through Balogh's account at the Bank and the Bank would wire money directly to the jewelry merchants involved in the transaction; (5) Chacko would submit copies of all of Balogh's purchase invoices to the Bank; and (6) Chacko would proffer to the Bank a $600,000 cash deposit or "cash margin."

In the ensuing months, Chacko submitted monthly inventory statements to the Bank, representing that Balogh's inventory was at the required level of $15 million. These inventory statements were false. Chacko also arranged for the Bank to wire money for purported jewelry purchases to Henry Berk, Gerald Modell, Frank Mastoloni, and Paul D'Auria, but, in most cases, there were no jewelry transactions. Instead, these men, at Chacko's direction, sent most of the money back to Chacko.[1]

In 1993, Chacko requested an additional one million dollar loan from the Bank, which was supported by a forged inventory appraisal by Christie's. While the Bank granted the additional loan, it imposed many of the August 1992 loan conditions on Chacko, and, in addition, required that bank account statements from Balogh's business account with Citibank be submitted monthly.

Chacko initially submitted the required statements, but a Citibank representative testified that the statements proffered were altered, to indicate that Balogh was financial-ly healthy. In reality, Balogh was in great financial distress. In the spring of 1994, Chacko failed to submit the required statements, and, when the Bank requested such information, Chacko told the Bank that he would pay the entire principal of the loan, with interest, ahead of schedule. He repeatedly reiterated this promise, and he also informed the Bank that he would surrender approximately $15 million worth of inventory as security for the loan. Chacko never paid the loan, never surrendered the jewelry as security, and his assets, when seized by the Government, did not satisfy the loan.

Chacko was indicted on the above detailed six counts, and was tried before a jury. At trial, Chacko testified in his own defense. He maintained that Sunny Cherian, who was his accountant when Chacko obtained and maintained the loans, was responsible for the false documents submitted to the Bank. Cherian died before trial. Chacko testified that he signed blank forms which Cherian later fraudulently filled out, and he testified that Cherian was the person who altered Chacko's and Balogh's financial documents. In support of Chacko's contentions, he maintained that he was overseas when many of the false documents were submitted to the Bank, but other evidence, including his own passport and travel itinerary, indicated to the contrary. Numerous witnesses testified against Chacko, including a lawyer for the Bank who asserted that Chacko admitted during a meeting with the Bank's lawyers that there was never a Middle East venture, and that the loans were actually used to pay Chacko's debts.

The jury convicted Chacko on Counts One, Two, Three, Five, and Six. Chacko moved to set aside his convictions on Counts Two, Three, and Five as multiplicitous of his conviction on Count Six, the general bank fraud count. Chacko also moved to set aside the entire verdict based on the allegedly improper summation by the prosecution and the allegedly perjured testimony of several Government witnesses. Chacko further moved for acquittal on Count Six, contending that

---

1. It was from this fraudulently obtained money that Chacko was able to satisfy the $600,000 cash margin requirement.

the Bank did not prove beyond a reasonable doubt that Chacko intended to harm the Bank. The district court denied these motions. *See United States v. Chacko,* 1997 WL 481862 (S.D.N.Y.1997).

Judge Koeltl sentenced Chacko to 121 months' imprisonment. He declined to exercise his discretion to depart downwardly for family circumstances and strong community ties. He instead enhanced Chacko's sentence by four levels under § 3C1.1, § 2F1.1(b)(6)(B), and § 3B1.1(a) of the United States Sentencing Guidelines Manual ("the Guidelines") on the grounds that Chacko had obstructed justice, the transactions had involved more than a million dollars, and Chacko's role was as an organizer or leader in connection with the crime(s).

Chacko now appeals, arguing that the indictment was multiplicitous, the evidence was insufficient to prove beyond a reasonable doubt that Chacko intended to harm the Bank, the prosecutor's summation was improper, and the district court incorrectly made a four-level role assessment under § 3B1.1(a) of the Guidelines. For the reasons that follow below, we affirm the district court.

### Discussion

#### Indictment

Chacko contends that the indictment was multiplicitous, and therefore his convictions should be set aside. He argues that the same conduct was charged as underlying the false statement counts and the bank fraud counts. The district court determined both that (a) Chacko's multiplicity challenge was waived because it was not objected to prior to trial or at trial, and (b) the multiplicity argument was meritless. We do not agree that the claim was waived, but we agree with the district court's conclusion that the indictment was not multiplicitous.

■ An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed.[2] *See United States v. Holmes,* 44 F.3d 1150, 1153–54 (2d Cir.1995); *see also United States v. Nash,* 115 F.3d 1431, 1437 (9th Cir.1997). This violates the Double Jeopardy Clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once. *See* U.S. Const. amend. V; *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) ("In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies."); *see also United States v. Morgan,* 51 F.3d 1105, 1108 (2d Cir.1995) ("If a person is twice subject to punishment for the same offense, double jeopardy protection attaches.").

Federal Rule of Criminal Procedure 12(b)(2) provides that "[d]efenses and objections based on defects in the indictment" must be raised before trial. Fed.R.Crim.P. 12(b)(2). Failure to raise these objections results in their waiver. *See* Fed.R.Crim.P. 12(f). The allegedly multiplicitous nature of the indictment was clearly evident on its face, such that the objection should have been made prior to trial.

■ However, the Advisory Committee Notes indicate that a double jeopardy objection is not waived under Rule 12 if it is not made prior to trial: "In the other group of objections ..., which the defendant at his option *may* raise by motion before trial, .... [are] such matters as former jeopardy...."[3] Fed.R.Crim.P. 12 advisory committee's note 1944 (emphasis added). While a double jeopardy challenge can be waived, for example, as part of a plea agreement or if not asserted at the district court level, *see, e.g., Securities and Exch. Comm'n v. Palmisano,* 135 F.3d 860, 863 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 555, 142 L.Ed.2d 462 (1998), we do

---

2. The Fifth Amendment provides in part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb...."

3. Though the phrase "former jeopardy" is used in Rule 12 as opposed to "double jeopardy," the semantical difference is not meaningful. Such a

proposition needs no support but, for what it is worth, Black's Law Dictionary advises that former jeopardy is "[a]lso called 'double jeopardy.'" Black's Law Dictionary Fifth Edition 587 (1979).

not interpret Federal Rule of Criminal Procedure 12 to bar a double jeopardy argument qua multiplicity argument when it is made to the district court in a posture other than that of a pre-trial motion. It is an argument that "may" be made as part of a pre-trial motion or it can be made at a later time. *See* Fed.R.Crim.P. 12; *see also Pacelli v. United States*, 588 F.2d 360, 363 n. 8 (2d Cir.1978) (reviewing advisory committee notes and holding that "failure to raise a claim of former jeopardy before trial does not constitute a waiver under Rule 12(b)"). This might be a more troubling issue if the objection were never made. Here, however, it was at least made after the jury rendered its verdict. We hold it was not waived. We continue, then, to the substantive multiplicity analysis.

■ A double jeopardy question is one of law. *See Morgan*, 51 F.3d at 1110. As such, it is reviewed de novo. *See id.*

■ In assessing whether a defendant is impermissibly charged with essentially the same offense more than once in violation of the Double Jeopardy Clause of the Constitution, the touchstone is whether Congress intended to authorize separate punishments for the offensive conduct under separate statutes. *See Holmes*, 44 F.3d at 1154. It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the "offense"—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another. *See Hudson v. United States*, 522 U.S. 93, ——, 118 S.Ct. 488, 497, 139 L.Ed.2d 450 (1997) (Stevens, J., concurring in the judgment); *Dixon*, 509 U.S. at 704, 113 S.Ct. 2849 (overruling *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), test of "same conduct").

■ To assess whether the two offenses charged separately in the indictment are really one offense charged twice, the "same elements" test or the *"Blockburger"* test is applied. *See Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849 (affirming application of the *Blockburger* test). The *Blockburger* test examines whether each charged offense contains an element not contained in the other charged offense. *See Dixon*, 509 U.S. at 696, 113 S.Ct. 2849. If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted. *See id.; Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir.1995).

Although the long-standing constitutional bar to double jeopardy appears to be a straightforward legal concept, its judicial interpretation in many contexts has been fraught with equivocation. Fortunately, we can truncate our excursion through this viscid material because the double jeopardy issues raised here disappear upon examination.

■ Chacko argues that Count Six, which alleged a violation of § 1344, and Counts Two, Three, and Five, which alleged violations of § 1014, were multiplicitous. Section 1344 prohibits schemes to defraud a financial institution. *See* 18 U.S.C. § 1344 (1998). Section 1014 penalizes "[w]hoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." 18 U.S.C. § 1014 (1998). There is a fundamental difference between a scheme to defraud and a false statement made to influence the action of a federally insured institution. *Cf. Nash*, 115 F.3d at 1437–38.

Chacko argues that *United States v. Seda*, 978 F.2d 779 (2d Cir.1992) (2–1 decision), is binding in its holding that an indictment charging both § 1014 and § 1344 is multiplicitous. *Seda* applied a broader test than the *Blockburger* test, looking at whether one could violate § 1014 without violating § 1344, and determined that the likelihood of such was "remote." *Seda*, 978 F.2d at 782 (quoting district court). The court also determined that the Government's allegations stated two claims, of which one was a species of the other, and the court determined from its assessment of the statutes' legislative histories that Congress did not intend both claims to be pursued against one defendant. *See id.* at 782. The court held that the

Government must elect before trial whether to pursue § 1014 or § 1344. *See id.*

Chacko's reliance on *Seda* is misplaced, however, because he fails to acknowledge *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), which was decided shortly after *Seda. Dixon,* as we have said, overruled *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which applied a modified and broadened *Blockburger* analysis similar to that employed in *Seda.* To the extent that appellant uses *Seda* to support the proposition that it is appropriate to examine the specifics of the indictment and the nature of the counts charged when the underlying statute is broad, the implications of *Dixon* are preclusive. *See United States v. Wolfswinkel,* 44 F.3d 782, 785 (9th Cir.1995) (*Dixon* "disposes of [the] contention" that the *Seda* approach to the *Blockburger* test is still valid); *accord United States v. Fraza,* 106 F.3d 1050, 1054 (1st Cir.1997) (noting that *Dixon* "reaffirmed the mandatory application of *Blockburger* statutory analysis" and citing *Wolfswinkel*'s criticism of *Seda* ).

*Dixon* addressed the scope of the double jeopardy inquiry in a different context, but the Court's underlying reasoning still applies here. In *Dixon,* one of the appellants was prosecuted both for criminal contempt for violating the terms of release on a prior arrest and for the drug possession that constituted the contempt charge. *See Dixon,* 509 U.S. at 691–92, 113 S.Ct. 2849. The Supreme Court applied the *Blockburger* test and determined that some of the counts at issue were not barred. *See Dixon,* 509 U.S. at 703, 113 S.Ct. 2849. The Court then assessed whether the broader "same-conduct" test from *Grady* (which was similar to the analysis used in *Seda* ) would bar the remaining counts. *See id.* In considering *Grady,* a majority[4] of the Court determined that it should be overruled, as the " 'same-conduct' rule … is wholly inconsistent with earlier Supreme Court precedent and with the clear common-law understanding of double jeopardy." *Id.* at 704, 113 S.Ct. 2849. From a historical and constitutional perspective, the Court found no justification for continuing to apply it. *See id.* Whether we agree with one analysis or the other is immaterial.

In assessing Chacko's situation—an indictment charging both § 1014 and § 1344—we therefore cannot follow *Seda,* and we must instead model the *Blockburger* analysis as it was re-affirmed in *Dixon. See Knapp,* 46 F.3d at 178; *Wolfswinkel,* 44 F.3d at 785 (after *Dixon,* a "strict application of the *Blockburger* test to the elements of the charged statutes is appropriate").

■ The elements to be established under 18 U.S.C. § 1014 are (1) that the lending institution's deposits were federally insured; (2) that the defendant made false statements[5] to the institution; (3) that the defendant knew the statements made were false; and (4) that the statements were made for the purpose of influencing the institution to make a loan or advance. *See Fraza,* 106 F.3d at 1053 (citation omitted).

■ Bank fraud is defined under 18 U.S.C. § 1344, which provides that,

Whoever knowingly executes, or attempts to execute, a scheme or artifice-

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; ·

---

4. The Court in *Dixon* was bitterly divided over overruling *Grady,* with five of the nine Justices writing opinions. *See Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). It is a bit of an exercise to track which Justice accords with whom in the separate opinions, and some courts seem to treat the portion of *Dixon* overruling *Grady* as a plurality. *See Wolfswinkel,* 44 F.3d at 785. In *Dixon,* Justice White, when dissenting from the portion of the judgment overruling *Grady,* noted that "[t]he majority nonetheless has chosen to consider *Grady* anew and to overrule it." *Dixon,* 509 U.S. at 740, 113 S.Ct. 2849. We accord the weight of a majority opinion to *Dixon* 's treatment of *Grady.*

5. Until recently, it was unclear whether the false statements made had to be material. In *United States v. Wells,* 519 U.S. 482, 492, 117 S.Ct. 921, 928, 137 L.Ed.2d 107 (1997), the Supreme Court specified that § 1014 has no materiality requirement.

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (1998); *see United States v. Brandon*, 17 F.3d 409, 424 (1st Cir.1994); *Fraza*, 106 F.3d at 1053 (citing *Brandon*). A scheme or artifice to defraud includes "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *Id.* at 424 (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3rd Cir.1987)) (citation omitted).

Section 1344 requires a "scheme or artifice," while § 1014 does not. Section 1014 requires that a false statement be made to obtain a loan or advance, while § 1344 has no such requirement. The *Blockburger* test—that each charged offense contain one element that the other does not—is thus met here.[6] The district court's determination that the indictment was not multiplicitous is therefore affirmed.

### Sufficiency of the Evidence Sustaining Defendant's Intent to Defraud

Chacko contends that, while there was clearly evidence that the Government was harmed, the Government did not prove that Chacko had the requisite intent to injure the Bank, which is an element of bank fraud under 18 U.S.C. § 1344. He maintains that the evidence that he never tried to evade the Bank, that he was engaged in negotiations with it, and that he did not manifest a refusal to pay it precluded a finding by the jury of the requisite element of intent to harm the creditors. The district court, in finding that the jury verdict was supportable by the evidence, determined that "[t]he Government introduced at trial ample evidence that could have led a rational trier of fact to conclude that Chacko did not intend to repay the loans." *United States v. Chacko*, No. 96 CR. 519, 1997 WL 481862, at *5 (S.D.N.Y. Aug.21, 1997).

A defendant challenging the sufficiency of the evidence supporting his conviction bears a "heavy burden." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994) (quotation omitted). He must show that, when viewing the evidence in the light most favorable to the Government and drawing all permissible inferences in favor of the Government, a rational trier of fact could not find that the crime charged was proved beyond a reasonable doubt. *See id.* Nevertheless, a conviction cannot stand when the Government has not introduced sufficient evidence to sustain each essential element of the crime charged beyond a reasonable doubt. *See id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

Intent to harm is an essential element in proving bank fraud under 18 U.S.C. § 1344. *See United States v. Frank*, 156 F.3d 332, 336 (2d Cir.1998). While it is not necessary that the scheme to defraud ultimately be successful or harmful, the Government must show that the schemer contemplated actual harm or injury. *See D'Amato*, 39 F.3d at 1257.

When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud. *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir.1970) (intent to injure may be inferred, particularly where the scheme has the effect of injuring as a "necessary result of carrying it out") (internal citations omitted); *accord D'Amato*, 39 F.3d at 1257 ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself.") (citing *Regent Office Supply*). In this case, Chacko had nowhere near the assets and inventory needed to back the funds he was obtaining from the Bank. Nor did Chacko present evidence at trial that he had an immediate plan to garner the inventory or cash equivalent to pay back the funds he borrowed. It therefore would be clear to anyone in Chacko's position that he

---

**6.** Judge Kearse's remark in her dissent in *Seda* that "application of the *Blockburger* test to §§ 1014 and 1344 reveals that there is a way to violate either section without violating the other" is relevant here. *Seda*, 978 F.2d at 782.

was likely going to harm the Bank by being unable to repay what he had borrowed when such money became due. *See Regent Office Supply Co.*, 421 F.2d at 1181. Even if the Government did not point to any direct evidence of fraudulent intent—namely, that Chacko intended to get "something for nothing," *Regent Office Supply*, 421 F.2d at 1181 (quotation omitted)—given the circumstances surrounding Chacko's actions, intent to injure the Bank can be inferred.

█ We reject Chacko's contention that the evidence of his negotiations with the Bank and his failure to flee when repayment of the funds was called for refutes the argument that he had the intent to injure the Bank. Whether Chacko was engaged in negotiations with the Government because he did not intend to defraud the Government or whether Chacko was engaged in negotiations because he did not want to face criminal prosecution is not a determination for an appellate court to make. Rather, this is a factual determination, appropriate for resolution by the jury, going to the essence of whether the requisite intent was established. *See United States v. Malsom*, 779 F.2d 1228, 1233 (7th Cir.1985).

### Prosecution's Remarks

█ Chacko contends that the prosecutor's remarks in summation violated Chacko's Fifth and Sixth Amendment rights.[7] The prosecutor said:

> Now, you heard the defendant try to explain away everything beginning with his attempt to separate himself from the numerous fake documents in this case. Of course, the defendant knew he had to explain them, the documents, away because Gus Lesnevich, the handwriting expert, positively identified the signature and handwriting as Kurian Chacko's.
>
> And don't forget, ladies and gentlemen, that the defendant listened to the testimony of 15 witnesses first before he got on that witness stand. He had time to figure

out a way to tailor his testimony to those facts. But what did the defendant tell you? First, he tried to explain away the many documents by testifying that, yes, he signed numerous documents that contained or that now show his signature; yes, those documents may have ended up in the bank files, but that the defendant did not know what ended up in the letters at the time he signed them because he blindly trusted Sunny Cherian. . . .

The district court repeatedly offered to give a curative instruction after Chacko's counsel objected to this portion of the summation, but appellant declined such. Instead, the appellant moved after the jury returned their verdict to set aside the entire verdict. In deciding not to vacate Chacko's conviction, the district court determined that (1) this situation was distinguishable from *Agard v. Portuondo*, 117 F.3d 696 (2d Cir. 1997), *reh'g denied*, 159 F.3d 98 (2d Cir.1998), in that the prosecutor here had presented significant evidence of fabrication throughout the trial and the prosecutor did not focus on the appellant's unique right to be present during trial as compared with the other witnesses; and (2) even if the remarks were improper, they were harmless in light of the overwhelming evidence against Chacko. *Chacko*, 1997 WL 481862, at *6–8. We agree.

*Agard* has a much narrower holding than appellant would have us believe. *Agard* was a habeas corpus case stemming from a state court trial involving sodomy and weapons possession. *See id.* at 698. The appellant Agard petitioned for a writ of habeas corpus, contending that the state trial court erred in, among other things, allowing the prosecution in closing arguments to imply that Agard, by virtue of being present in the courtroom throughout trial, had the unique opportunity, on which he capitalized, of being able to fabricate his testimony to rebut the state's evidence. *See id.* The federal district court denied the petition for the writ, but granted Agard a certificate of probable cause to ap-

---

**7.** The Fifth Amendment provides in part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... to be informed of the nature and cause of the accusation; [and] to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI.

peal to the Second Circuit. A divided panel of this court reversed and remanded the case to the district court, determining that the prosecutor's remarks in summation did violate Agard's Fifth, Sixth, and Fourteenth Amendment rights. While, at first blush, the *Agard* situation might seem analogous to this situation, there are some noteworthy differences.

In *Agard*, we held "only that it is constitutional error for a prosecutor to insinuate to the jury for the *first time* during summation that the defendant's presence in the courtroom at trial provided him with a unique opportunity to tailor his testimony to match the evidence." *Id.* at 708–09 (emphasis added). We said that "the Sixth Amendment right to confrontation prohibits a prosecutor from commenting in summation that a defendant's testimony may be viewed in light of his presence in the courtroom during trial." *Id.* at 710. However, we went on to say that

> Only those comments which specifically target and cast suspicion upon the defendant's unique Sixth Amendment right to be present at his trial and hear all testimony are forbidden by the Constitution; those remarks are not simple commentary upon credibility, nor are they necessary to a prosecutor's argument that the defendant lacks credibility, if that argument has a basis in fact and not only in innuendo.

*Id.* at 711–12.

Moreover, in denying a petition for rehearing in *Agard*, we emphasized that we disavowed the suggestion that

> it is constitutional error for a prosecutor to make a factual argument that a defendant used his familiarity with the testimony of the prosecution witnesses to tailor his own exculpatory testimony. Although one factual element of such an argument may be the presence of the defendant during the trial, its principal focus is on a comparison of defendant's testimony with the testimony of other witnesses.

*Agard v. Portuondo*, 159 F.3d 98, 99 (2d Cir.1998).

In this case, the district court correctly noted that the prosecutor's comments were in conjunction with the prosecution's general theme throughout trial that Chacko had fabricated much of his side of the story. This was not a case where Chacko's credibility was impugned as a non sequitur. Rather, the prosecution had woven a sustaining web of evidence of Chacko's contradictions and inconsistencies. The prosecution's summation reiterated the argument that Chacko had the opportunity to be the liar that the prosecution insisted he was, and, as such, the summation was not improper.

Chacko also contends that the prosecution's summation implied to the jury that the prosecution had extra-record evidence, not available to the jury. Moreover, the summation, he maintains, constituted an impermissible misrepresentation of the evidence. Both of these contentions are without merit. That the defendant had the opportunity to tailor his statements to meet the prosecution's case is not an extra-record fact nor is it a misrepresentation of the evidence. Both points were obvious to anyone watching the trial, and the prosecution presented evidence to sustain such.

We affirm the district court.

### Four–Level Enhancement

■ Chacko argues that four levels were incorrectly added to his offense level by the district court after the court erroneously determined that his role in the offense was that of organizer and leader of a criminal activity that was "otherwise extensive" under Section 3B1.1(a) of the Sentencing Guidelines. This argument is without merit.

■ When reviewing the sentence imposed by the trial court, we review the court's legal determinations de novo, and we accept the court's factual determinations unless we find that they are clearly erroneous. *See United States v. Liebman*, 40 F.3d 544, 547 (2d Cir.1994). The court's assessment of whether the criminal activity orchestrated and led by Chacko was "otherwise extensive" was a factual determination, reviewable under the clearly erroneous standard. *See, e.g.*, *United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir.1996) (determination of whether the criminal activity at issue was "otherwise extensive" was a factual finding); *United States v. Melendez*, 41 F.3d 797, 800 (2d Cir.1994)

(assessment of number of participants under Section 3B1.1(a) involves factual finding).

The relevant portion of Section 3B1.1, "Aggravating Role," instructs the sentencing court as follows:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

*U.S. Sentencing Guidelines Manual* § 3B1.1(a) (1998).

The parameters of what is "otherwise extensive," unfortunately, do not lend themselves to rigid definition. In the "Applications Notes" portion of the "Commentary" following Section 3B1.1, we are advised that:

> In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

*U.S. Sentencing Guidelines Manual* § 3B1.1, comment. (n.3). Even given this insight, however, "otherwise extensive" determinations are not easy.

■ We have generally interpreted Section 3B1.1 as a headcount of unknowing participants, but we have required some specificity in the sentencing court's count of the heads and the acknowledgment of the roles played. *See, e.g., United States v. Carrozzella,* 105 F.3d 796, 805 (2d Cir.1997). A sentencing court must consider the role and actions of the unknowing participants in addition to the raw number of innocent participants, and the court must summarize its consideration of both. *See id.* at 804.

■ In *Carrozzella,* it was not sufficient for the district court to note that

> "[I]n addition to the three participants who were criminally responsible, the services of other employees of the law firm, an ac-

counting firm and stockbrokers were used to carry out the scheme, and eight individuals who were not participants were involved as partners in real estate investments...."

*Id.* at 804 (quoting district court). We instructed the district court, on remand, more specifically to define the roles of the unknowing participants. *See id.* at 805. In so instructing, however, we did not and do not intend to obligate district courts to regurgitate the facts in the record. Rather, the district court need only state the general identity of the unknowing participants (or category thereof, in instances where numerous institutional employees were indiscriminately drawn into the scheme) and the basic tasks which these participants unwittingly conducted for the organization.

In this case, the district court addressed both knowing[8] and unknowing participants and their roles in the scheme with great specificity. The district court detailed the actions of Mr. Cherian, Mr. Lalieu, Mr. D'Auria, Mr. Mastoloni, and several other bank officials referred to in Chacko's own testimony who accepted bribes to facilitate Chacko's financial exploits. *See* Sentencing Transcript at 39–42, United States v. Chacko, No. 96 Cr. 519 (S.D.N.Y. January 22, 1998). There were no vague references to lawyers, bankers, accountants, re-insurers, or the like without substantial detail to make clear their roles in the "otherwise extensive" scheme. *See Carrozzella,* 105 F.3d at 805. We affirm the district court's four-level enhancement.

### Conclusion

For the reasons set forth above, the district court is affirmed.

---

8. Whether there were five or more knowing, criminally responsible participants in satisfaction of § 3B1.1 need not be fully analyzed here be- cause the district court correctly found instead that this scheme was "otherwise extensive."