### UNITED STATES of America,

v.

**RW PROFESSIONAL LEASING SERVICES CORP., also known as "Professional Leasing Services," Rochelle Besser, also known as "Rochelle Drayer," Barry Drayer, Roger Drayer, Adam Drayer, Myrna Katz, Stephen Barker, and Payaddi Shivashankar, Defendants.**

**No. 02 CR 767(ADS)(MLO).**

United States District Court,
E.D. New York.

Sept. 29, 2006.

162

Roslynn R. Mauskopf, United States Attorney Eastern District of New York, Cen-

tral Islip, NY, Linda A. Lacewell, and Steven L. Tiscione, Assistant U.S. Attorneys.

Elizabeth Macedonio, P.C., Elizabeth E Macedonio, Esq., of Counsel, New York, NY, Co-counsel for the Defendant Barry Drayer.

Steve Zissou & Associates, Steve Zissou, Esq., of Counsel, Bayside, NY, Co-counsel for the defendant Barry Drayer.

Kevin J. Keating, Esq., Garden City, NY, Attorney for the Defendant Stephen Barker.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This criminal prosecution arose out of a complex fraud scheme involving a financing brokerage company that was based on Long Island and in Massachusetts known as RW Professional Leasing Services, Inc., ("PLS"). The indictment charged the defendants Barry Drayer ("Drayer") and Stephen Barker ("Barker") (collectively the "Defendants"), among others, with one count of conspiracy to commit bank fraud and wire fraud in violation of 18 U.S.C. §§ 371, 1343, 1344, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(h). In addition, the Defendant Drayer was charged with five counts of bank fraud, in violation of 18 U.S.C. § 1344. On February 17, 2006, after a three-week trial, the Defendants were convicted on all counts. Currently before the Court are the following motions by the Defendants: (1) for a judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P."); and (2) for a new trial under Fed.R.Crim.P. 33.

## I. BACKGROUND

### A. PLS Lending Practices

PLS operated from 1991 to 2002 as a provider of financing to medical professionals who wished to purchase new medical equipment or obtain funding in connection with maintaining a medical practice. PLS operated out of two offices, one in Island Park, New York, and the other in Massachusetts. The Massachusetts office handled collections, credit, customer service, and all dealings with lenders and funding sources. Drayer managed the Massachusetts office of PLS on a day-to-day basis, and also made decisions for the company as a whole. He was officially the Vice–President and a Director, but he called himself the chief executive officer of the company. Susan Cottrell worked for Drayer in the Massachusetts office of PLS, she was responsible for running credit checks for loan applications and typing up documents for the loan contracts.

The New York office handled most clerical and administrative functions and maintained the company's bank accounts. Rochelle Besser, Drayer's sister, ran the New York office. She was officially designated as the President and a Director the company. However, Drayer stated in a deposition taken in connection with civil litigation between PLS and AT & T that was read into the record, that although in the "technical sense" he reported to Besser, in many instances he made the final decision. Roger Drayer, Barry Drayer's brother, was the Vice President of Marketing and Operations. He was responsible for sales and marketing in the New York office. Cottrell, Roger Drayer, and Besser all testified at the trial against the Defendants as cooperating witnesses for the government.

PLS was a company that arranged for financing for medical providers. PLS did not originate the funding for the loans it issued, but rather acted as the financing

broker. In this capacity, PLS arranged to obtain financing for medical professionals from lending institutions, and also serviced the loans after they were issued. PLS typically engaged in three types of transactions: (1) equipment leasing transactions, in which PLS would directly buy equipment chosen by a medical professions and lease the equipment back to the doctor; (2) sale-leaseback transactions, in which a doctor would sell existing equipment to PLS and PLS would lease the same equipment back to the doctor; and (3) working capital loans, in which money was lent to the doctor without any specific collateral, other than a blanket lien against the practice.

PLS had relationships with a variety of financial companies to either provide capital loans directly to the borrower, or lend PLS funds for the purpose of entering into leases with medical providers. These funding sources included federally-insured community banks, through a broker known as Crawford & Sons, and non-bank lenders such as AT & T Capital and First Sierra.

The federally-insured community banks, such as Alliance Bank, Northwest Bank, and People's Bank, engaged in portfolio lending, in which the bank would lend money to PLS based on an agreement that included a portfolio or group of equipment leases. Under the terms of the agreements, PLS typically serviced the loans that were made to the medical providers. If an individual borrower, such as a doctor, prepaid the loan by paying the balance of the loan early, PLS was required to either remit those proceeds to the funding institution or substitute the paid off lease with a new lease of equal value. Similarly, if a borrower defaulted or went bankrupt, PLS was required to either pay the bank or substitute another transaction.

The non-bank lenders, First Sierra and AT & T Capital, serviced their own loans.

First Sierra and AT & T used a "lockbox," in which invoices under the PLS name were sent to the doctors, and the doctors wrote checks payable to PLS, and PLS forwarded the checks to a mailbox under the lender's control. If a doctor's payment was late, PLS had the obligation to collect money from the doctor. If the borrower defaulted, PLS was responsible to pay the full amount of the loan to the lender. If a doctor went bankrupt, PLS was required to notify the lender and pay the loan in full or "substitute" it, that is, PLS would finance another loan with its own money and then assign the stream of payments to the lender.

Within this framework, PLS, under the direction of Barry Drayer, devised a number of schemes to defraud the funding institutions by concealing the nature of the collateral, the distribution of the loan proceeds, and the payments made on the loans. These schemes included, but were not limited to, the following: (1) the use of phony and forged financial instruments; (2) the "Mailbox Etc." and "Pay Ahead" scheme; (3) the multiple lending scheme; (4) the Riteway and GHT sham companies; (5) the Hospitality Services of Middle Tennessee ("HSMT") scheme; (6) the Carefree and MedPro conspiracy; and (7) the concealment of records from auditors.

### B. The Fraudulent Schemes

#### 1. The Use of Phony and Forged Financial Instruments

One of the first schemes devised by PLS was developed to trick the lending institutions into accepting payments from PLS on behalf of borrowers. Under the "lockbox" system PLS arranged with the non-bank lenders, the borrower was required to send payments directly to the bank. First Sierra accepted payments from PLS on behalf of borrowers from time to time,

but would require proof that a doctor had actually paid PLS before accepting the payment directly from PLS. To fulfill this requirement, PLS created altered or forged financial instruments purporting to show that borrowers had paid PLS. This scheme prevented the lender from learning that the borrower had stopped making payments for one reason or another, which would have required PLS to remit the remaining balance of the loan.

The phony check scheme was offered to the jury through the testimony of the actual employees who forged the phony checks and documents. Frank Zambaras testified that he scanned and altered checks through the use of a computer at Roger Drayer's request. Zambaras altered the amount on the checks, the dates on the checks and check numbers by scanning the checks into a computer and using digital imaging editing software to make the alterations. Roger Drayer supplied Zambaras with the checks to be altered with a note affixed to them as to what modifications were needed on the checks. Roger Drayer told Zambaras that there was nothing wrong with the alterations because the checks were not being presented for payment, but only for false proof that the doctors had paid PLS. When Zambaras was unwilling to continue forging the checks, he showed Roger Drayer how to scan and modify the checks on the computer using Corel Photo Paint.

PLS also created phony telechecks, which are documents that show proof of payment by telephone. These phony documents were used for the same purpose as the phony checks. Jennifer Tarantino, Roger Drayer's daughter and the defendant Barry Drayer's niece, testified that she created these phony documents. PLS generated between 1,000 and 1,500 of the telechecks to submit to the banks as phony evidence of proof of payment. Tarantino testified that, pursuant to Barry Drayer's written instructions, she and other employees in New York created unauthorized telechecks to make it look like doctors had paid their monthly bill to PLS on outstanding loans, when in fact they had not. (Tr. 1088–89). Tarantino stated that she participated in this fraudulent conduct daily for a total period of two years.

Adam Drayer, Jennifer Tarantino's brother and Roger Drayer's son, testified that he created false Western Union receipts along with employee Frank Zambaras, for the same purpose of providing the banks with phony proof that a doctor had submitted payment to PLS.

All of these witnesses testified that they created these false instruments at the direction of Barry Drayer. According to Roger Drayer: "Barry had called me one day and asked me to go to Frank [Zambaras] and ask Frank if we could take a check that was already there, and alter the date or the check number or the amount on it. Not for the purpose of cashing it, but for the purpose of sending it as proof to request a payment that was made." (Tr. 1392–93). Roger Drayer also testified that he acted at Barry Drayer's direction when he instructed employees of the New York office to fax lists of accounts requiring phony telechecks to be created, and when he diversified the scheme to include phony Western Union money grams.

### 2. The "Mailbox Etc." and "Pay Ahead" Scheme

A second scheme involved the use of accounts at Mailbox Etc., to intercept invoices sent by First Sierra and AT & T intended for PLS borrowers. PLS used this scheme for borrowers who had gone bankrupt or prepaid the amount of the loan. Instead of notifying the financial institution of the bankruptcy, or remitting the prepayment as required, PLS con-

cealed the fact and kept the funds for its own use. Besser testified that Barry Drayer sometimes directed her to hold onto the prepayment, rather than remitting the funds to the bank. This became more prevalent toward the later years of the scheme. PLS used these proceeds for operating expenses and for making payments on defaulted loans. (Tr. 518).

Lynn Walker, a former PLS employee, was responsible for customer service and collections at PLS. (Tr. 2185). As part of her collection duties Walker would contact delinquent doctors and receive payment checks. Walker testified that she was supposed to record any payments that came directly to PLS, but Barry Drayer instructed her that she was not to record any large check received on the First Sierra account. Instead, Drayer instructed Walker to send those checks to the PLS New York office and have Rochelle Besser call him regarding the check. (Tr. 2192–193). When doctors called to prepay loans, Drayer instructed Walker to have the doctor send the payoff check to the PLS Massachusetts office rather than the bank. When PLS kept the money on prepaid loans, it would make monthly payments to the funding source on those accounts.

To conceal the fraud, PLS provided First Sierra or AT & T with a change of address form to redirect the borrower's mail to a Mailboxes Etc. maildrop account in the same geographic area as the borrower. This diversion prevented the doctor from knowing that the loan had not been paid to the financial institution, and permitted PLS to make timely payments to the bank, with the use of the phony payment instruments.

This same scheme was used with the federally insured banks. Besser testified that Crawford & Sons' pension and profit sharing plan invested in certain PLS loans.

In some cases, the pension plan would provide a bridge loan until particular leases could be funded through an FDIC bank, and in other cases, the pension fund directly invested or lent money to fund such leases. (Tr. 485). Al Crawford, the broker for the banks, called Besser in March 2002 about one of the loans funded by the pension fund. Crawford was angry after learning that PLS had received a prepayment of over $300,000 on a loan to Dr. Ojeager, and had failed to remit the proceeds to the Crawford pension fund. In addition, Besser prepared and authenticated a summary chart (Gov't Ex. 122) of bank loan files (Gov't Ex. 8–33) and related PLS pay histories (Gov't Ex. 122–A). (Tr. 717–19). The summary showed that the loan files included fourteen bankruptcies, and twenty-eight prepayments, where PLS kept the money instead of sending it back to the bank.

Tarantino testified that she managed the Mailboxes Etc. accounts. There were approximately 100–200 Mailbox Etc. accounts. (Tr. 1109, 1399). She stated that she opened accounts at Mailboxes Etc. to "receive invoices that were sent from the bank to the doctor." (Tr. 1104). An employee from Massachusetts, Wendy Cutillo, typically sent instructions from Barry Drayer with the information necessary to change the doctor's address and open a mailbox account. (Tr. 1109). Other exhibits were introduced by the government showing faxes between Roger Drayer and Barry Drayer concerning setting up the Mailboxes Etc. accounts. (Gov't Ex. 35A, 36A & 37A).

Eventually, PLS closed the Mailboxes Etc. accounts because Barry Drayer learned that if an account was paid ahead, then First Sierra would not generate an invoice, because no balance was due. Thus, the mail-drop scheme was replaced with this simpler "pay ahead" scheme.

### 3. The Multiple Lending Scheme

In this scheme, PLS submitted a legitimate loan application to several different lenders, without the borrowers consent. Upon approval, PLS kept the funds from some of the multiple lending, without remitting the proceeds to the applicant. PLS fraudulently retained the other loans for its own use. The government introduced a summary chart showing thirty-two loans where the bank funded PLS, but PLS kept the money rather than forwarding it to the borrower. (Tr. 728).

Dr. Eve Ann James–Wilson, a dentist, testified as a victim of this multiple lending scheme. Dr. James–Wilson applied for financing from PLS in 2001, seeking a "consolidation loan" to cover credit card debts and other loans she had amassed from the purchase of an existing dental practice and dental equipment. (Tr. 383). Dr. James–Wilson executed loan documents for two $50,000 loans with PLS for existing equipment. However, she did not receive any of the $100,000 promised. She contacted PLS and spoke to Barry Drayer, who said there was a technical difficulty, but that her money should be deposited in her account within the next week. (Tr. 401). Dr. James–Wilson never received any money from PLS, but received bills for two loans by Alliance Bank and Bank of Taney County. She subsequently received two letters from PLS to Bank of Taney County and Alliance Bank, stating that Dr. James–Wilson's loans "have not been funded" and further stating that PLS remained liable for the outstanding obligations.

### 4. The Riteway and GHT Sham Companies

A third scheme involved disguising the character of the loans. PLS provided lease agreements for both the purchase of new equipment and promissory notes for working capital loans. (Tr. 488). However, funding for working capital loans was more difficult to obtain, and typically these loans were capped at $50,000. On the other hand, lease agreements for new equipment were favored by the bank and the loans could be for as much as $300,000, depending on the price of the equipment. (Tr. 490). To capitalize on this distinction, PLS created several schemes to fraudulently disguise working capital loans as ones secured by new equipment.

Riteway Health Services ("Riteway") was a sham company created at the direction of Drayer for the purpose of obtaining new equipment leases. (Tr. 1407–08). Riteway's sole purpose was to issue false invoices for new equipment, in instances where the doctor already owned the equipment, to make it appear as if the equipment being leased was new. PLS created purchase invoices under Riteway's name, and then submitted the invoices to the funding sources so that any loan could be approved as one for new equipment.

Susan Cottrell, an employee at PLS, testified about the Riteway invoices. To Cottrell's knowledge, Riteway did not even exist except on paper, and Riteway did not sell any equipment to PLS that she was aware of. She stated that she prepared Riteway invoices by using a template and copying a list of equipment off of a schedule. Although Cottrell filled in the invoices by inserting the doctor's address in the "ship to" box, Cottrell never arranged for any equipment to be shipped, and to her knowledge, PLS never arranged for any equipment to be shipped from PLS. Significantly, Riteway invoices were never sent to the doctors.

Barry Drayer provided Cottrell with the amount to enter on the Riteway invoice and it always equaled the amount of the loan. (Tr. 2351). Barry Drayer instructed Cottrell how to prepare Riteway invoices and informed her which deals needed to

have Riteway invoices prepared. (Tr. 2352). Barry Drayer told Cottrell not to send Riteway invoices to doctors. (Tr. 2353). Cottrell knew it was wrong to send the Riteway invoices to the funding sources, but she testified that she did because she was instructed to do so by Barry Drayer. (Tr. 2354, 2356).

Tarantino was the nominal President of Riteway, but the company had no employees, no equipment, and no money. The false invoices it issued were created in Massachusetts. Further, PLS created checks from PLS to Riteway to make it appear than the invoices had been paid. Copies of these checks were then sent to First Sierra or AT & T, as proof of payment. After submitting the false payments, PLS voided the checks.

Cottrell testified that she conducted verbal audits for PLS, the ostensible purpose of which was to make sure the doctor understood the lease agreement, and that he received the new equipment. (Tr. 2401). These audits were documented and submitted to the funding institutions as part of the loan application. However, Cottrell was directed by Drayer to avoid questions about the equipment on Riteway deals because the equipment was not new, and the doctors already had it in their offices.

GHT was another company formed in Tarantino's name. This company was formed to reduce PLS's tax liability by buying PLS losses or receivables that could no longer be collected at a discount. Roger Drayer developed this idea and discussed it with Barry Drayer. (Tr. 1413). The evidence showed that GHT was a fictitious entity. It did not spend any money to "buy" PLS' losses or any receivables, but PLS' financial statements falsely reflected that such transactions occurred. (Tr. 1413).

### 5. The Hospitality Services of Middle Tennessee ("HSMT") Scheme

The use of fake invoices from Riteway was instrumental in the HSMT scam. The HSMT scam involved the funding of a fraudulent loan to a hotel under the false statement that it was a medical clinic. Riteway issued numerous fake invoices for new medical equipment to HSMT to support these loans. However, the evidence showed that HSMT never applied for funding from PLS, and that it was a hotel, not a medical clinic.

Dr. Kodihalla Channabasappa, a cardiologist in Tennessee and a partner in HSMT, and Prabhakar Pallapothu, an investor in HSMT, both testified that HSMT was a hotel, and that it was not in the medical business, nor was it authorized to operate a medical practice. Indeed, HSMT did not even borrow money from PLS. When shown loan documents purporting to show that HSMT had borrowed money from PLS, Dr. Channabasappa and Pallapothu stated that their signatures had been forged. (Tr. 1701–02, 1778–80). Dr. Channabasappa further testified that HSMT received mail from banks regarding these unauthorized loans, and that he contacted the banks who directed him to Barry Drayer. Dr. Channabasappa contacted Drayer, and Drayer was unable to explain why the loans were issued.(Tr. 1778–80; Gov't Ex. AB–3B).

Cottrell testified that she arranged to have another company verify the equipment that was sold to HSMT. However, the company informed her that the location was a hotel, and that it could not get in to all of the rooms to check the equipment because they were occupied by guests. (Tr. 2431). In fact, HSMT had no medical equipment. Cottrell also stated that to her knowledge, Barry Drayer never informed First Sierra that HSMT was a hotel and not a medical clinic. (Tr. 2434–

435). Further, Cottrell was not aware of any other occasion in which PLS arranged financing for a hotel. (Tr. 2435).

In sum, HSMT was a massive fraud. Records produced at trial showed that PLS arranged 17 loans for HSMT in the total amount of $2,343,140.15. PLS received $2.3 million from banks, but only paid out $650,000 to HSMT. (Tr. 2435–439).

### 6. The Carefree and MedPro Conspiracy

Defendant Barker operated a scheme similar to the Riteway phony invoice plot. Barker controlled two companies based in California known as MedPro Equipment Co. ("MedPro"), and Carefree Financial Services ("Carefree"). Under the direction of Barker, Carefree acted as a broker for PLS, preparing and remitting loan applications to PLS for submission to the lending institutions. The government characterized MedPro as Barker's "Riteway," a sham corporation with the sole purpose of issuing false medical equipment invoices to ensure that inappropriate lending applications would be approved. Carefree used the same types of documents as PLS and nearly all of Carefree deals sent to PLS had MedPro invoices indicating that the loan was secured with new medical or dental equipment.

Cottrell testified that she received the finalized loan documents from Carefree for PLS. Cottrell reviewed the documents and forwarded the applications to Crawford & Sons, who would forward them to the community banks. On First Sierra deals, Cottrell would send the documents to the PLS New York office, which would then forward them to First Sierra. Cottrell stated that MedPro invoices often falsely purported to show equipment being purchased by PLS from MedPro, and shipped to doctors. PLS paid out loans by sending a wire transfer to a MedPro bank account and commissions to Carefree by a separate check. These commissions were approved by Barry Drayer. In total, hundreds of Carefree deals were funded by First Sierra.

Cottrell conducted verbal audits on MedPro deals similar to the ones for Riteway, using the same audit sheet (Gov't Ex. 118–E). On these verbal audits, Barker called the doctor and arranged for a conference call between the three parties. (Tr. 2406–407). As with the Riteway deals, Cottrell did not ask any questions regarding equipment because the doctors already had the equipment and it was not new equipment. Cottrell stated that she conducted hundreds of verbal audits with Stephen Barker on MedPro deals. In those hundreds of verbal audits, neither Cottrell nor Barker ever mentioned the name MedPro. (Tr. 2408–409).

In addition, Cottrell testified that she prepared delivery and acceptance receipts for loan packages. These receipts purported to certify that equipment involved in a particular loan had been "delivered, inspected, installed, is in good working condition, and accepted by the undersigned [doctor] as satisfactory." (Tr. 2411; Gov't Ex. Ab–5C). Cottrell prepared the receipts on Riteway deals and Carefree prepared the delivery and acceptance receipts on MedPro deals. (Tr. 2410–411). The receipts were included in both Riteway and MedPro applications to the banks at the direction of Barry Drayer. Cottrell believed that the receipts were not truthful representations because the equipment on Riteway and MedPro deals was not new, and thus had not been delivered, inspected, and accepted by the doctors. (Tr. 2411–412).

Tallie Jo Allen, who worked at Carefree as an administrative assistant from June of 1999 through April of 2002, prepared loan

documents and sent them to doctors for execution. Allen testified that 100 percent of Carefree's business was done with PLS. (Tr. 1029–30). Allen explained that she would send out blank applications for the doctors' signatures and if Carefree did not receive an equipment list from the doctor, Carefree would fill in the list after the doctor had signed the blank document and sent it back to Carefree. (Tr. 1038). Allen did not know whether the equipment list provided by the doctor listed new equipment or equipment already owned by the doctor, but all of the schedules listed equipment under the heading "new equipment description." Allen was never instructed to change the list to included used equipment.

Allen also prepared MedPro invoices and answered a phone line for MedPro, even though she was not an employee of MedPro, and never met any employees of MedPro. Allen was not aware of any address, building, or other physical location for MedPro other than the P.O. Box listed on the invoice. She never took any customer orders for equipment and was not aware of anyone else in the office taking equipment orders from customers for MedPro. (Tr. 1045). There was never any equipment stored in the office and Allen never saw any reason to believe that MedPro had a warehouse where equipment was kept.

MedPro invoices were always billed to PLS, and never to another company. (Tr. 1045–46). Allen created approximately 200 MedPro invoices, which were sent to PLS along with the rest of the loan paperwork. (Tr. 1040–41). Stephen Barker instructed Allen how to prepare the MedPro invoices. The MedPro invoice was created by inserting the equipment listed by the doctor in the loan application into a template. The template had "Professional Leasing" inserted as the standard "sold

to" company on every invoice. (Tr. 1045–46). The total amount for the invoice was provided to Allen by Stephen, Evan or Bryn Barker, and the value on the invoice always equaled the amount of the loan. Allen added the doctor's address in the "ship to" box on the MedPro invoices, but never arranged for any equipment to be shipped from MedPro to the doctor, nor was she aware of any equipment ever being shipped. Sometimes Allen would receive invoices from other vendors showing that the doctors had purchased equipment from another vendor and not MedPro. However, this equipment that was purchased from other vendors was still inserted on the MedPro invoices as new equipment sold by MedPro.

Allen testified that every deal involving equipment contained a MedPro invoice. If there were mistakes in an invoice, Allen would simply correct it and send a new invoice to PLS without contacting anyone from MedPro. If she ever had any questions regarding MedPro, she would ask Barker. Allen never received a call from a doctor asking about MedPro and never mentioned the name MedPro to any doctors. (Tr. 1041–42). MedPro invoices were not signed by doctors and were never sent to the doctors. (Tr. 1042–43). In fact, she was instructed by Stephen Barker to "say that we didn't have the equipment." (Tr. 1050).

Several doctors who applied for financing with Carefree testified at the trial. Doctor Tim Silegy, an oral and maxillofacial surgeon, testified that in 2000 he applied for a working capital loan in the amount of $50,000 and an additional $25,000 loan from Carefree Financial. After receiving the proceeds for the loans, Dr. Silegy canceled the $25,000 loan and sent a check for $25,000 to PLS. (Tr. 1186, 1188–91). Sometime later, Dr. Silegy received a billing inquiry from Alliance Bank

requesting payment on the cancelled loan. (Tr. 1191–92, 1194–95). When showed a MedPro invoice, (Gov't Ex. AB–1D), for new equipment attached to the Alliance Bank loan, Dr. Silegy stated that he had not received this invoice and that the listed equipment was not new, but had already been in his office at the time of the loan.

Dr. Anita Srinivasa, an internist, testified that she applied for financing from Carefree Financial in 2001 to purchase an existing medical practice in Thousand Oaks California. (Tr. 1265–66). Dr. Srinivasa dealt with Stephen Barker at Carefree and arranged for two loans, a $50,000 working capital loan and a $55,000 equipment loan. (Tr. 1266). According to Dr. Srinivasa, the $105,000 in borrowed funds was for the purchase of an existing medical practice and old equipment that was already present in the office of the practice. Dr. Srinivasa testified that she received the $50,000 for the working capital loan, but never received the proceeds for the $55,000 equipment loan. Despite having never received the proceeds from the loan, Dr. Srinivasa received invoices from Crown Bank Leasing seeking payment on the equipment loan. (Tr. 1275). When showed a MedPro invoice, (Gov't Ex. CB–2A), from the Crown Bank loan that Dr. Srinivasa was billed for, but had never received, Dr. Srinivasa stated that she had not received this invoice in connection with her loan. She testified that the invoice was false because she did not purchase any new equipment from MedPro as part of the deal, and the equipment listed on the invoice was existing equipment in the office that she was purchasing, not new medical equipment. (Tr. 1268–71).

### 7. The Concealment of Records from Auditors

Finally, the government adduced evidence that Drayer attempted to conceal the fraudulent schemes from the banks. In July of 2001, Zambaras testified that he was present during a meeting with representatives from First Sierra at the New York offices of PLS in which First Sierra stated its intention to conduct a review of the accounts at PLS. Prior to the meeting, Zambaras stated that he informed that Roger Drayer had prepared "an additional set of records for this visit for audit." (Tr. 217–18). Zambaras was told that if he was "asked to pull up any physicians lease accounts, rather than going into the normal screens," Zambaras should "go into a duplicate set of records and present what I assume[d] was altered information." (Tr. 217–18). Zambaras examined the duplicated database and found that it varied from the company's actual records in that the duplicated records contained payments that had not been made and gave the impression that delinquent accounts were in fact current. When Zambaras was asked to show First Sierra representatives account records for specific doctors, Zambaras ignored the instructions of Roger Drayer and provided the original, unmodified information. (Tr. 220). Shortly after the audit, First Sierra terminated their relationship with PLS and from that time, it appeared to have a difficult time funding new loans. (Tr. 222–23).

## II. DISCUSSION

### A. The Post Trial Motions

#### 1. The Rule 29 Standard of Review

The standard of review on a motion for judgment of acquittal is well-settled. In the Second Circuit it has been repeatedly stated that a defendant challenging a conviction on the basis of insufficient evidence bears a heavy burden. *United States v. Thomas*, 377 F.3d 232, 237 (2d Cir.2004); *United States v. Tocco*, 135 F.3d 116, 123 (2d Cir.1998); *United*

*States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996). This is because the evidence must be viewed in the light most favorable to the government and all permissible inferences must be drawn in its favor. *See United States v. Irving,* 452 F.3d 110, 117 (2d Cir.2006); *United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004); *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996); *see also United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989). The court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. *Tocco,* 135 F.3d at 123; *see also United States v. Pelaes,* 790 F.2d 254, 259 (2d Cir.1986). A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997). Further, the elements of the crimes charged may be proved entirely by circumstantial evidence. *See United States v. Sureff,* 15 F.3d 225, 228 (2d Cir.1994). Also, the court must consider the evidence in its totality, and not in isolation. *United States v. Rosenthal,* 9 F.3d 1016, 1024 (2d Cir.1993). "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). With these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

### 2. The Rule 33 Standard of Review

Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33. The rule by its terms gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992); *see also United States v. Robinson,* 430 F.3d 537, 543 (2d Cir.2005). In such a motion, the court may weigh the evidence and credibility of witnesses, but cannot "wholly usurp" the role of the jury. *United States v. Autuori,* 212 F.3d 105, 120 (2d Cir.2000); *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999). Generally, unless there are exceptional circumstances, the court must defer to the jury's resolution of conflicting evidence and assessment of witness credibility. *Sanchez,* 969 F.2d at 1414. "An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief." *United States v. Ferguson,* 246 F.3d 129, 133, 134 (2d Cir.2001) (quotations omitted).

Indeed, this standard has been described as a "heavy burden," *United States v. Fearon–Hales,* No 04–231, 2005 WL 2385845, at \*1, 2005 U.S. Dist. LEXIS 21619, \*3 (S.D.N.Y. Sept. 27, 2005), and "[i]t is well-settled that motions for new trials are not favored and should be granted only with great caution." *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson,* 246 F.3d at 134.

### 3. The Conspiracy to Commit Bank and Wire Fraud Conviction

Both defendants were convicted of conspiracy to commit bank fraud and wire

fraud. Drayer was also convicted on five counts of the substantive act of bank fraud. The statute prohibiting bank fraud, 18 U.S.C. § 1344, provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

*Id.*

It is well-established that to support a conviction for the crime of bank fraud, "the government must prove that defendant '(1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss.'" *United States v. Crisci,* 273 F.3d 235, 239–40 (2d Cir.2001) (quoting *United States v. Barrett,* 178 F.3d 643, 647–48 (2d Cir.1999); *see United States v. Autorino,* 381 F.3d 48, 52 (2d Cir.2004); *United States v. Ragosta,* 970 F.2d 1085, 1089 (2d Cir.1992); *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.1992)).

The elements of wire fraud are similar. To secure a conviction for wire fraud, the government must prove three elements: (1) a scheme to defraud victims, (2) of money or property, (3) through use of the interstate wires. *See United States v. Walker,* 191 F.3d 326, 334 (2d Cir.1999)

Both of these crimes require that the defendant have intent to commit fraud, and it is the only element that the defendants in this case contest. To establish the requisite fraudulent intent, the government need only produce circumstantial evidence in the form of inferences deduced from facts and situations. *Id.* at 1090 (citing *United States v. Celesia,* 945 F.2d 756, 760 (4th Cir.1991)). The Second Circuit has instructed that courts should "look at the entire circumstances of defendant's conduct as an indication of the requisite criminal intent." *Barrett,* 178 F.3d at 648. "When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud." *United States v. Chacko,* 169 F.3d 140, 148 (2d Cir.1999) (citing *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1181 (2d Cir.1970))

#### i. As to the Defendant Drayer

Overwhelming evidence was presented at the trial to show that Drayer had the requisite intent for both the conspiracy and substantive act of bank and wire fraud. The evidence plainly supports the rational inference that Drayer, acting in concert with others, directed or supervised no less than seven distinct schemes to fraudulently obtain funds from financial institutions. One of these schemes alone, the use of phony and forged checks, has routinely been found to support convictions for bank fraud. *See Crisci,* 273 F.3d at 240; *United States v. Jacobs,* 117 F.3d 82, 93–94 (2d Cir.1997); *Barrett,* 178 F.3d at 648; *Stavroulakis,* 952 F.2d at 695; *United States v. Morgenstern,* 933 F.2d 1108, 1112–14 (2d Cir.1991). Numerous witnesses testified that Drayer directed that phony, false, and forged checks and other financial documents be drafted and submitted to banks for the purpose of obtaining funds. This scheme alone is sufficient to permit a rational juror to find that

Drayer had the intent to harm financial institutions.

In addition, the other PLS schemes that Drayer directed sufficiently established the requisite intent to expose financial institutions to actual or potential losses. The purpose of the Riteway scheme was to disguise unsecured loans as loans secured by the sale and leaseback of new medical equipment. This was accomplished by submitting phony invoices to banks purporting to show that doctors had purchased new equipment from Riteway that would be used as collateral to secure the loan under lease agreements. In fact, the equipment was not new, and the invoices purporting to show the sale of the equipment to Riteway were drafted and submitted without the knowledge or consent of the borrower. This scheme exposed the bank to both potential losses, because unbeknownst to the bank the loans were effectively unsecured, and actual losses when the borrower defaulted or prepaid and PLS did not remit the funds to the bank as required under its agreement.

Drayer argues that the officers and employees of PLS lacked the experience, expertise, and intelligence to lawfully run the multimillion dollar company. The Defendant's claim that he was ignorant or lacked the specific intent to defraud the financial institutions is fanciful in the face of such substantial evidence. The business of PLS was simple, it was the middleman-broker for medical professionals who wished to obtain loans from financial institutions. Drayer and the coconspirators in PLS complicated this lawful business by devising intricate and unlawful schemes to conceal the nature of the collateral; the distribution of the loaned proceeds; and the payments made by the borrowers. These schemes were devised to trick the banks into lending money when it otherwise would not; use proceeds that rightfully belonged to the bank; and ultimately make PLS a more profitable and competitive entity. It was abundantly clear to anyone in Drayer's position "that he was likely going to harm the Bank by being unable to repay what he had borrowed when such money became due." *Chacko*, 169 F.3d at 148–49.

The Court also finds no merit in the Defendant's argument that he lacked criminal intent because prior to the indictment he contacted the lending institutions, advised them of the financial problems, and tried to settle the matter. The Second Circuit has explicitly rejected the contention that evidence of such negotiations with a bank can, as a matter of law, refute the argument that a defendant has the intent to injure the bank. *Id.* at 149. Instead, the Second Circuit has made it clear that it is for the jury to decided whether the requisite intent was established. *See id.* (citing *United States v. Malsom*, 779 F.2d 1228, 1233 (7th Cir. 1985)).

Drayer also argues that the evidence shows that he had no intent to harm the banks because he repeatedly instructed the employees at PLS to make sure the banks received their payments. Drayer's mantra of "pay the bank" does not absolve him of criminal intent. Undeniably, the testimony shows that Drayer went to great lengths to make sure that PLS sent the banks their monthly payments. However, the monthly payments were the gravamen of the fraud. PLS only paid the much smaller monthly payment and concealed the fact that they were required to remit the entire amount of the loan. This ensured that the banks would not be tipped off that the loans PLS was making monthly payments on had defaulted, been prepaid, or lost to bankruptcy. In sum, the evidence was more than sufficient for a

jury to find that Drayer had the requisite intent to victimize banks, and the Court finds no exceptional circumstance to justify a new trial on this count.

### ii. As to the Defendant Barker

 Barker was not charged with the substantive act of bank fraud, only conspiracy to commit bank and wire fraud. "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir.2001) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir.1999)). For a criminal conspiracy, "the government 'must prove that the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime.'" *Samaria*, 239 F.3d at 234, (quoting *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir.1996)).

 "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir.2003) (quotations omitted); *see United States v. Desena*, 260 F.3d 150, 155 (2d Cir.2001); *United States v. Jones*, 30 F.3d 276, 282 (2d Cir.1994). A jury is permitted to infer that there was a conspiracy or tacit agreement based on circumstantial evidence alone. *United States v. Santos*, 449 F.3d 93, 103 (2d Cir.2006); *see also United States v. Chang An–Lo*, 851 F.2d 547, 554 (2d Cir.1988) ("[S]ince 'conspiracy by its very nature is a secretive operation,' the elements of a conspiracy may be established through circumstantial evidence.") (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.1980)). "In cases of conspiracy, deference to the jury's findings 'is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Snow*, 462 F.3d 55, 68 (2d Cir.2006) (quotations omitted); *see also United States v. Mulder*, 273 F.3d 91, 109 (2d Cir.2001).

In this case, the offenses that were the objects of the conspiracy were bank fraud against the federally-insured community banks and wire fraud against the other lending institutions such as First Sierra and AT & T. Barker's primary argument is that Carefree was the innocent broker for PLS corrupt products, extending the loans to the doctors without any knowledge that they were fraudulent or used to dupe the banks. At the trial, the jury rejected this argument, and the Court finds that this verdict was amply supported by the evidence.

 There was sufficient circumstantial evidence for a rational jury to conclude that Barker entered into an agreement, or had a tacit understanding, to commit bank fraud and wire fraud. Barker admitted that he had met Drayer and other employees including Susan Cottrell in the early 1990's when he worked at Centaur Finance. The evidence showed that Carefree worked almost exclusively and on a daily basis with PLS. In addition, the evidence showed that MedPro was a sham company that operated in almost an identical manner to the PLS sham company Riteway. The evidence further established that Carefree issued false MedPro invoices to show that medical providers applying for funds had purchased new equipment. Cottrell stated that MedPro invoices often falsely purported to show equipment being purchased by PLS from

MedPro, and shipped to doctors. Barker participated in the verbal audits of the doctors conducted by Cottrell in which MedPro, the purported purchaser and lessor of the equipment, was never mentioned. Several doctors who had borrowed funds through Carefree also testified that the equipment they had was not new, and that they never had any prior dealings with a company called MedPro. From this evidence, the jury was able to infer that there was an agreement, or at a minimum a tacit understanding, between Drayer at PLS and Barker at Carefree to submit fraudulent applications to banks for the purpose of obtaining loans that the banks would not have otherwise issued.

The government also showed that Barker had a financial motive to engage in the fraud. The evidence established that Barker received over $4.3 million in commissions from the fraudulent MedPro loans he brokered with PLS. Cottrell testified that these commissions had to be approved by Drayer. Moreover, by his own admission to Special Agent Howard, his entire business depended on this criminal partnership with Drayer. (Tr. 2912–13). Without Barry Drayer helping Barker push his working capital and debt consolidation loans to the banks by falsely representing them as new equipment loans, Stephen Barker probably would have had no business. Indeed, as the jury was permitted to infer from the testimony of the lender witnesses, many of the funding sources did not want to lend money on riskier loans that were not secured by new equipment. It was through the illicit agreement with Drayer, and the use of the sham company MedPro, that Barker was able to secure approximately $4.3 million in commissions.

Barker contends that the jury was prejudiced by the spillover effect of the amount of evidence presented against Drayer. This argument is without merit.

"The typical spillover claim is that evidence admissible against only one defendant is prejudicial to [another] defendant[ ] and that individual trials should have been held to avoid that prejudice." *United States v. DiNome,* 954 F.2d 839, 843 (2d Cir.1992). In this case, although the amount of evidence directed at Drayer—the leader of the conspiracy—was substantially more than that offered against Barker, all of the evidence related to the same ongoing criminal conspiracy to commit bank fraud. The evidence regarding Drayer's criminal acts was equally admissible against Barker to show the entirety of the bank fraud conspiracy. Thus, there was no prejudicial spillover.

Finally, Barker claims that he was prejudiced by the introduction of evidence showing his failure to pay sales taxes. This argument is also without merit. Evidence of nonpayment of taxes is admissible under Rule 404(b) of the Federal Rules of Evidence when it is relevant to show proof or intent or knowledge, and accompanied by a limiting instruction. *See United States v. Bok,* 156 F.3d 157, 165 (2d Cir.1998). Here, the government offered the evidence of nonpayment of sales taxes as proof that MedPro was a sham company. The evidence was also used as proof that the MedPro invoices were false because Barker included a line item for sales tax to make the invoices look like real invoices. The Court finds that this was a permissible use of such evidence.

Accordingly, the evidence was more than sufficient for a jury to find that Barker had an agreement or tacit understanding with Drayer to defraud the banks, and the Court finds no exceptional circumstance to justify a new trial on this count.

### 4. Conspiracy to Commit Money Laundering

In order to prove a conspiracy to commit money laundering, the government

must show that the defendants, (1) knew that the property involved in a financial transaction represented the proceeds of unlawful activity; (2) conducted or attempted to conduct a financial transaction that involved the proceeds of the unlawful activity; and (3) either had the intent to promote the carrying on of that unlawful activity or the knowledge that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity. *See United States v. Gotti,* 459 F.3d 296, 334 (2d Cir. 2006); *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997); *see also Whitfield v. United States,* 543 U.S. 209, 219, 125 S.Ct. 687, 694, 160 L.Ed.2d 611 (2005).

### i. As to the Defendant Drayer

Drayer argues that he did not have the criminal intent to commit money laundering. The evidence shows otherwise. Testimony established that PLS received money from the banks through wire transfers into the "063" account. Under the agreements with the banks, this money was then suppose to be sent directly to doctors to fund the loans that had been approved by the banks or held in escrow accounts. Instead, the money was transferred to the "E" account where it was commingled with the general funds of PLS. The "E" account was used to pay the operating expenses of PLS, which included the unlawful payment of defaulted or bankrupt loans, and continued monthly payments on cancelled or prepaid loans. By commingling this money into the "E" account, Drayer hid the source of the funds and promoted the fraudulent scheme by using these proceeds to make monthly payments on defaulted, bankrupt, or prepaid loans. Based on this proof, there was sufficient evidence for a jury to find that Drayer had the requisite intent to promote the use of the fraudulently obtained funds

to make additional fraudulent monthly payments, or the knowledge that such transactions concealed the true source of the funds. Accordingly, the Court finds that there was sufficient evidence to sustain the jury's verdict on money laundering by Drayer, and no exceptional circumstances exist to warrant a new trial on this count.

### ii. As to the Defendant Barker

The evidence was also sufficient to establish Barker's intent to commit money laundering. At the trial, the government offered evidence that $24 million was wired from PLS to MedPro, and then approximately $19 million was immediately transferred to an account held by Carefree under the control of Barker. Special Agent Galioto, testified that most of the money PLS wired to MedPro was immediately transferred to a Carefree account and dispersed as Barker saw fit. This evidence was sufficient to for the jury to find that Barker and Drayer arranged for proceeds from the bank fraud and wire fraud—the loan proceeds that were obtained through the use of fraudulent loan documents such as the MedPro invoices—to be deposited into a MedPro account in order to make it appear that MedPro was a real company that was receiving payments on real invoices, when in fact, it was a sham company that had issued sham invoices. These financial transactions disguise the nature, source, and ownership of the original funds and promoted the unlawful activity. Accordingly, the Court finds that there was sufficient evidence to sustain the jury's verdict on money laundering by Baker, and no exceptional circumstances exist to warrant a new trial on this count.

### III. CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that the motion by the Defendants for a judgment of acquittal under Rule 29(c) is DENIED; and it is further

ORDERED, that the motion by the Defendants for a new trial under Rule 33 is DENIED.

SO ORDERED.